IN THE UNITED STATES DISTRICT COURT OF
TENNESSEE, EASTERN DISTRICT

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No.: 3:18−cv−00411−CLC−DCP |
| | ) | |
| vs. | ) | Jury Demanded |
| | ) | |
| ROSS  UNIVERSITY | ) | Judge Collier |
| SCHOOL OF MEDICINE; | ) | |
| ADTLEM CORPORATION, | ) | |
| | ) | |
| Defendants | ) | |

---

## FIRST AMENDED COMPLAINT

---

John Doe, by and through counsel, for his cause of action against Defendant Ross University School of Medicine (hereinafter "Ross"), submits his first amended complaint and avers as follows:

## JURISDICTION & VENUE

1.      The jurisdiction of this court is invoked pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, and 28 U.S.C. § 1331. This Court has subject matter jurisdiction over Plaintiff's state law claims under 28 U.S.C §§ 1367 and 1651.

2.      The amount in controversy exceeds $75,000, exclusive of interest and costs. In addition, an actual controversy exists between Plaintiff and Ross, justiciable in character, in respect to which John Doe seeks a declaration of his rights and appropriate further relief under the provisions of 28 U.S.C. §§§ 2201, 2202 and 1651.

3.      This Court has personal jurisdiction over defendant Ross because it regularly does business and engages in other persistent courses of conduct in this district.

4.    Venue is proper in this district pursuant to 28 U.S.C. § 1391, as Defendant Ross is located in this district and a substantial part of the events giving rise to this claim occurred in this district.

## PARTIES

5.    John Doe is a citizen of the United States of America and is a student attending Ross on their Basic Science Campus, temporarily located in Knoxville, TN.

6.    Ross University Medical School is a private international medical school and is a member of Adtalem Global Education. Ross is currently located in in Knoxville, TN.

7.    Adtalem Global Education is a global education provider headquartered in Chicago Illinois, United States. Adtalem is the parent company to Ross and several other educational institutions.

8.    Ross is the recipient of federal funding significant enough to render it a state actor. Title IX's prohibition on discrimination in admissions applies only to institutions of vocational education, professional education, and *graduate higher education*, and to public institutions of undergraduate higher education. 20 U.S.C. § 1681(a)(1); 34 C.F.R. § 106.15. (emphasis added)

9.    According to the Office for Civil Rights, "All public colleges and universities and virtually all private colleges and universities are covered because they receive such assistance by participating in federal student aid programs."[1]

## FACTS

10.    Ross University has a contract or agreement with American hospitals in various states wherein students are permitted to do their clinical rotations stateside.

11.    Doe enrolled in Ross in 2012.

---

[1] OCR Frequently Asked Questions Excerpt, Attached as Exhibit A

12.    There are two tracks students can take at Ross; Students can take four semesters or five semesters of classwork, consisting of basic sciences similar to classes taken in traditional American medical schools. All students take the same number of classes but with the five-semester option the classes are spread over a longer period of time.

13.    Doe opted to take the five-semester program and was scheduled to complete all basic science classwork last month in August 2018.

14.    Hurricane Maria greatly affected the school. Due to the devastation of the hurricane, the students had to evacuate the island and were given the option of completing the semester on a boat or taking a gap semester.

15.    Doe elected to complete the semester on the boat, but the conditions were unendurable; poor internet service, limited food, unsanitary conditions, and ill individuals. Because there were no proper classrooms, students often took exams in their rooms and because of that there was an excess of cheating. When students would disembark, they were often robbed by local islanders. Because of these conditions Doe finally opted to withdraw and take a gap semester. This put him behind one semester.

16.    While still on island Dominica, a female medical student (" ZH") began stalking and sexually harassing Doe.

17.    After completing one semester on the boat, the school was moved to Knoxville, Tennessee.

18.    When the campus opened in Knoxville, Doe began attending classes again.

19.    ZH discovered where Doe lived in Knoxville and began coming to his apartment, uninvited, multiple times per week. Doe did not let her in when she came.

20.    Doe often took video of ZH because he did not trust her and wanted proof that de did not hurt her or do anything to encourage her to remain at his apartment.

21.     Doe informed ZH he was engaged in an arranged marriage and would be getting married soon. This seemed to increase ZH's behavior and her visits to his apartment became more frequent.

22.     In one instance, ZH was outside of Doe's apartment in Knoxville in the middle of the night.

23.     She banged on the apartment door and screamed until eventually someone called campus security. Security arrived and escorted ZH away from Doe's apartment.

24.     ZH received no discipline for her conduct.

25.     Doe made it very clear that he was not interested in a relationship with ZH, but she continued to demand entry into his apartment seeking sexual engagement.

26.     While in Knoxville, ZH's stalking and harassment became so severe that Doe on one occasion attempted to run away from his apartment. ZH to followed Doe to the parking lot of his complex. Doe got in his car and drove away but ZH followed him. She was tailgating unsafely, and Doe became scared and drove towards the Ross campus security building and called a security officer to report the situation. The security officer instructed Doe to drive there and stay in his car. ZH also drove to the security building, got out of her car and approached Doe. She was stopped by campus security[2].

27.     ZH reported to campus security that Doe had scratched her.

28.     Doe did not scratch her, but she may have been scratched when she attempted to physically blocked Doe from running away from her.

29.     The responding police officer, after interviewing them both, indicated to Doe that he doubted ZH's story.

---

[2] Campus Security Report dated March 13, 2018

30.     The following day. Matthew Fulton of the Office of Student Affairs called Doe in and had him sign a mutual no-contact order. Doe signed the no-contact order but asserted his belief that ZH would continue her harassment and stalking. Doe was told not to worry, and they (Ross) would take care of it.

31.     The next day ZH showed up again at Doe's apartment demanding entry and sex.

32.     Doe informed ZH he would report her for coming over after they both signed the no-contact orders. ZH then explicitly offered Doe sex in order to resolve the matter and Doe declined.

33.     The following morning, Doe reported ZH's breach of the order to the Office of Student Affairs. Mr. Fulton wrote it down on something other than a proper complaint form and said he would "look into it."

34.     ZH continued this routine for several days, with Doe reporting her to the school each time. Ross did nothing to stop ZH's behavior or discipline her. Doe reported her almost every time, but Ross administration repeatedly ignored his complaints and requests for help.

35.     About a week later, on April 1st, 2018, ZH was knocking very loudly on Doe's door demanding to be let in. Doe called the Knoxville police and the responding officer told ZH to leave and advised Doe to get a restraining order against her. Doe reported the police encounter to Student Affairs, again ZH was not disciplined.

36.     Doe reported to Student Affairs that ZH repeatedly requested sex almost every time she contacted him.

37.     Doe provided Mr. Fulton with several videos of ZH at his apartment trying to force her way into the apartment.

38.     The school was provided all of the information about her sexual harassment and stalking, along with the videos of evidence before any Title IX complaint even filed.

39.     One day after taking a final and having a few drinks, Doe, in a drunken state, texted ZH and invited her over.

40.     ZH questioned whether it was a trick and thought Doe was planning to call and report her for violating the no-contact order. Doe told her that he would not report her if she came over. Doe was saying he would agree to waive the no-contact order for the night if ZH wanted to come over. Doe was merely saying that he would not report her this time if she came to his apartment.

41.     Doe admits he was drunk when he made this call and requested ZH to come over. An inebriated party is considered incapable of giving consent to any sexual behavior.[3]

42.     Excerpts from the Ross University School of Medicine Student Handbook, containing the "Message from the Dean and Chancellor," and policy on Sexual Misconduct are attached hereto as Exhibit B. The entire Student Handbook is available online.[4]

43.     ZH had repeatedly violated the no-contact order multiple times and had shown no concern for the consequences even though she was aware that Doe had reported her behavior multiple times to Mr. Fulton.

44.     ZH was under no obligation or duress to go to Doe's apartment for sex and knew that Doe was drunk when he made the request.

45.     Despite this, ZH went to Doe's apartment and the two engaged in consensual sexual relations.

46.     Following that encounter ZH was angry that Doe did not continue their relationship or contact her after the sexual encounter. ZH retaliated against Doe by reporting to the school that Doe had threatened her with reporting the multiple no contact violations if she did not have sex

---

[3] RUSM Student Handbook Excerpt Pages, Page 22
[4] http://medhandbook.rossu.edu/

Case 3:18-cv-00411-DCP   Document 29-1   Filed 12/31/18   Page 6 of 26   PageID #: 136

with him. ZH used the opportunity to punish Doe when he did not continue a relationship with her by reporting that he blackmailed her - forced her - to have sex with him so he would not report the violations of the no contact order.

47.     Recall that ZH had never shown any concern for the consequences of violating the order.

48.     ZH continued to show up at Doe's apartment and continued her stalking behavior 2-3 times per week.

49.     Doe became despondent and stopped reporting her conduct to the school because it was clear that nothing was being done about it.

50.     Doe was informed by his neighbor that ZH would knock on Doe's door multiple times throughout the day when he was not home.

51.     Her behavior continued into the summer semester.

52.     The school finally sent out a charge letter to ZH, months after the car chasing incident on March 19th. She was not suspended or otherwise disciplined.

53.     At this point when ZH withdrew from the school but continued to show up at Doe's apartment. Doe kept refusing to let her in and closed the door on her many times.

54.     In June Doe went home for a week to visit his family and his neighbor told him ZH came and knocked on Doe's door almost every day and tried leaving a note under his door.

55.     ZH repeatedly threatened to call Doe's mother to tell her that she and Doe had had sex and that they were involved in a relationship. Doe's mother would be deeply offended if Doe was involved in a relationship with another girl because he was arranged to be married. This is clearly retaliatory behavior and Doe was the party put under duress.

56.     ZH continually sent Doe emails, hoping that he would respond to her.

7

57.     These events resulted in severe distress for Doe over two semesters, nearly causing him to fail exams.

58.     At this point Doe was STILL being harassed by ZH and felt betrayed by the school. Doe somehow managed to pass his semester despite the immense stress he endured.

59.     A few days after ZH reported that Doe "blackmailed" her, she went to Doe's apartment again and told him that she had reported his text messages to Student Affairs and told him that she deeply regretted reporting him and admitted she had done it out of anger for making her leave the night they had sex, and because he would not continue their relationship.

60.     ZH again offered Doe sex as a way to compensate for reporting him, which he refused.

61.     Doe went to Mr. Fulton again and explained to him what had happened and reiterated ZH's persistent sexual harassment of him. Mr. Fulton assured Doe that he understood everything and gave the impression that he would write a report about it.

62.     A Title IX charge was filed against Doe for which an "investigation" and hearing were held.

63.     Doe was never informed of his right to file Title IX charges against ZH, nor was he offered protection by the school as a victim of sexual misconduct.

64.     Doe was treated differently and less equitably than ZH because Ross refused to take any action after multiple notices that ZH was stalking and sexually harassing Doe and violating the no-contact order while both were enrolled students, but prosecuted Doe severely for one sexual encounter with ZH.

65.     Nothing about the hearing was fair for Doe and he did not understand most of what occurred. ZH was given an advisor and assistance by the school. Doe was not.

66.     Doe did not understand that he had the right to an advisor or an attorney, nor was he ever informed of his right to view any evidence ZH submitted, nor did he have any opportunity to present witnesses to be interviewed during the investigation.

67.     At Doe's hearing, Ross did not take ZH's repeated and relentless advances toward Doe into consideration when contemplating whether ZH was truthful regarding the one sexual encounter between the two.

68.     It is not immaterial that ZH had willingly offered herself sexually many times to Doe, both before *and after* this one encounter, which is of particular importance when the standard for deciding a sexual misconduct charge is a preponderance of the evidence.

69.     Ignoring Doe's many reports and videos of ZH's behavior demonstrated Ross' wanton disregard for substantial and material evidence.

70.     There is no evidence to support the theory that ZH's assertions about being under duress to have sex with Doe are more likely true than Doe's assertion that the sex was consensual.

71.     ZH's sexual misconduct never gave rise to a disciplinary hearing or a Title IX investigation or hearing.

72.     ZH was given the luxury of a video call-in to testify without having to face the hearing committee. Doe was subjected to harsh judgment by the hearing committee, comprised mostly of women, intensely scrutinized while disregarding his testimony. Doe's multiple reports of ZH's sexual misconduct were never introduced into evidence, nor were they even mentioned.

73.     Doe was not given the opportunity to cross examine ZH, or even ask her questions through the panel.

74.     The hearing committee's attitude toward Doe was presumptively that he had taken advantage of ZH and that her harassment of him was worthy of consideration.

9

75.     Mr. Matthew Fulton, to whom Doe had made all of his reports, did not speak at all at the hearing and sat quietly, even though he had been Doe's direct point of contact regarding his allegations against ZH, and who had a firsthand account of everything.  The *only* time Fulton spoke was when Doe checked his phone when he said, "You'd better not be recording this hearing."

76.     Fulton said nothing in defense or Doe, nor did he ever explain to the hearing panel that Doe had made multiple reports to him and given him video evidence, campus security reports and police reports.

77.     After the hearing Fulton led Doe out and told him that the outcome of the hearing would be along the lines of a simple probation and that Doe would be able to appeal, that he should not worry about it for now because the decision would come in a few days. Doe's suspension notice came later that same day. Mr. Fulton took a week-long vacation the following day without returning Doe's emails.

78.     After the hearing Doe appealed and his suspension, which was immediately denied.

79.     Upon Fulton's return, he told Doe that he went over his appeal with Dr. Bryan Hayes and recommended to uphold Doe's suspension. When Doe asked him about the severity of this on his studies, he essentially told him "tough luck" and to "deal with it." Doe explained to him and Dr. Hayes of the stress a suspension would put on him academically and financially and they explained that his only option was to withdraw from the current semester, since Doe was in danger of failing, and get an additional short-term loan to pay for his apartment lease while he was not in school.

80.     Doe suffered extreme depression and was provided no support options at the initiation of the Title IX investigation. Therefore, he had no one to turn to.

81.     Doe is now married and would like for ZH to leave him alone, yet she has continued to contact his mother.

82.     The latest contact was in September 2018 and was reported to Ross, and to Doe's knowledge, they have not even contacted ZH regarding her activity.

83.     ZH continually harassed Doe for over a year. The only mistake Doe made was to contact ZH once, when he was drunk (and thereby incapable of consent) to ask if she wanted to have sex, something she routinely begged him for.

84.     The outcome for ZH was wildly disproportionate to the outcome for Doe.  Doe was not treated the same way as ZH, but in fact was treated as though his one drunken indiscretion was far more serious than over a year of relentless stalking and sexual harassment by ZH.

## COUNT I – BREACH OF CONTRACT

85.     All preceding paragraphs are incorporated herein as if repeated in their entirety.

86.     The first page of the Ross University Student Handbook contains a "Message from Dean and Chancellor" which includes the following:

> "As a student doctor at RUSM, you will receive a dynamic and comprehensive medical education in which your professional success is our top priority. Again, your academic and professional success is paramount. Your journey as a RUSM student doctor is completed by our guidance and assistance helping you to obtain postgraduate training in your preferred medical specialty."

87.     Doe relied on these assurances when contemplating his education at Ross, and reasonably relied on them in deciding to pay Ross' tuition and move to Ross for his continued education.

88.     He applied to and enrolled in Ross and paid tuition and other fees and expenses. He did so in reliance with the reasonable expectation that the University would abide by its Student Handbook message directly from the Dean and Chancellor, along with his own personal communications with the school.

89.    To constitute a contract, an agreement between two parties must have been a bargained-for exchange. This occurs when a promise or performance (consideration) is provided from each side in exchange for a return promise or performance provided by the other side. Without a bargained-for exchange of consideration, there is no enforceable contract, but merely a gratuitous promise.

90.    Doe's agreement with Ross contained the essential elements of a contract. His tuition and expenses constituted consideration in exchange for the promises that Ross would deliver their written assurances.

91.    But for his reliance on Ross to act in a manner designed to prioritize his education and treat him with fairness and equity, Doe would not have taken a blind leap of faith the institution to which he paid consideration would treat him with justness and dignity.

92.    Doe also reasonably relied on the expectation that Ross would implement and enforce the promises and policies made in its official publications about Gender Based Sexual Misconduct, including the Student Handbook and all other official publications of the College.

93.    A contract implied in law or in fact was formed between the Ross University and Doe.

94.    "RUSM is committed to fostering an environment where any alleged violation of this policy is promptly reported and complaints are resolved in a fair and timely manner."[5] Ross violated this policy when it failed to act upon Does' repeated reports of sexual harassment.

95.    The contract contained an implied covenant of good faith and fair dealing and other specific written provisions from the Student Handbook and other unwritten rights guaranteed by law. Certain rights were and are guaranteed to every student at Ross involved in the disciplinary process, including those accused of sexual misconduct or assault.

---

[5] RUSM Student Handbook Excerpt Pages, Page 21

96.     Specifically, Defendant Ross is accused of the following breaches:

**Breach of the Obligation to Treat Parties of a Sexual Misconduct Charge Fairly and Equally**

97.     Doe was never treated as a victim despite being the first reporter of sexual misconduct he was experiencing by ZH, nor were his many reports investigated or acted upon, despite Fulton's assurances that they would be.

98.     The Ross handbook states that the actions of ZH should have triggered an automatic referral to the school regarding sexual misconduct. At the very least, Mr. Fulton was a mandatory reporter responsible for communicating ZH's sexual misconduct violations to the Title IX coordinator.

99.     "The RUSM official who receives notification of alleged sexual and/or gender-based misconduct will offer appropriate support or refer the victim directly to immediate assistance. Assistance may initially require supported access to local medical, mental health, legal or law enforcement resources and could include academic accommodations, changes in housing for the victim or a respondent student, changes in working situations and other arrangements as may be appropriate and available (such as limiting orders, campus escorts, transportation assistance, or targeted interventions)."[6]

100.     "In any complaint of sex or gender-based misconduct, the person bringing the accusation and the responding party are *both entitled to the same opportunities for a support person or advisor of their choice throughout the process*, consistent with any guidelines set forth applicable to students or colleagues."[7] (emphasis added)

---

[6] RUSM Student Handbook Excerpt Pages, Page 26
[7] RUSM Student Handbook Excerpt Pages, Page 27

101.     The promise of fundamental fairness and the implied covenant of good faith require Ross University to conduct appropriate and unbiased investigations into all sexual misconduct allegations.

102.     Ross University failed to conduct an appropriate and unbiased investigation regarding the allegations against Doe.

103.     Doe was entitled to a support advisor of his choosing and had the right to select an attorney or legal counsel as his support advisor which was not made known to Doe. Doe expressed that he was ill at the beginning of the hearing and had not had time to prepare and the hearing panel disregarded his statements.

104.     At that time, Doe had neither been provided an advisor nor retained an attorney.

**Denial of Meaningful Right to Counsel**

105.     Ross violated both its own sexual misconduct policy, the promise of fundamental fairness, and the implied covenant of good faith and fair dealing by denying Doe a meaningful right to effective counsel at critical times throughout the investigation and disciplinary process.

106.     Doe was not afforded the right to have an attorney-advisor, with formal legal training and as is now requisite in the 6th Circuit, which includes all schools in Tennessee. If Doe was allowed to have an attorney advisor, he was not told this by Ross, and in fact, was encouraged *not* to have an advisor.

107.     The notion of a student being able to defend himself competently in the immensely emotional situation Doe found himself is absurd. Doe was intimidated, as any innocent student accused of sexual assault would have been and could not have been expected to prepare and deliver his version of the facts in a coherent and logical manner. Doe should not have been forced through the investigation and hearing process without counsel or a representative.

**Breach of Obligation to Provide Competent, Trained, Unbiased Investigators and Decision-Makers**

108.     Although Ross University's sexual misconduct policy is inexplicably devoid of an obligation that decision makers act without bias, the implied covenant of good faith and fair dealing and Ross University's promise of fundamental fairness obligated Ross University to provide Doe with unbiased, competent and trained investigators and decision makers and to ensure that the outcome of the investigation was not predetermined.

109.     Doe went to Mr. Mathew Fulton numerous times with his concerns and was placated when he believed his complaints were being treated as seriously as necessary under the Sexual Misconduct policies in the Student Handbook. The one instance where there was sexual activity invited by Doe, Doe was incapacitated. Had Doe been a female, his state of inebriation would have factored in and he would not have been at fault for those actions, however, he was found guilty of all activity despite his numerous complaints about ZH.

110.     The hearing panel to which Doe was subject was comprised primarily of women who were improperly trained or untrained altogether. At no point did ZH's version of events present itself as more likely than Doe's version. The hearing panel was incapable of determining whether the testimony and/or evidence provided met the standard of a preponderance of the evidence.

111.     Upon information and belief, none of the investigators or decision-makers involved in Doe's case had adequate training in adjudication, in the law of sexual assault, the weighing of evidence, the significance of forensic evidence, or in the relevance or irrelevance of particular types of evidence in the alleged sexual assault setting. Thus, Ross University breached its guarantees of due process and fundamental fairness, and the implied covenant of good faith and fair dealing.

## Breach of Obligation to Afford Doe an Opportunity for Confrontation and Cross Examination

112.   Ross University's sexual misconduct policy does not provide for any sort of cross examination of the accuser. This is now required under the very new case out of the 6th Circuit, Doe v. Baum2. The case explicitly states that when there is a credibility determination to be made the valuable tool of cross examination is important and necessary. It states that if the accuser is uncomfortable answering questions from the accused, an attorney for the accused may direct the cross examination. Simply because of this fact alone, there was a mishandling of this situation and the case must be reexamined- either at the school level or in the courts.

113.   Doe's right to confront Ross University's evidence against him is a key component of fundamental fairness. According to Doe v. Baum, a newly decided 6th circuit case from September 7, 2018, the right to cross examination is imperative and now a legal requirement. Doe was not afforded that opportunity.

## Breach of Obligation that there be Evidence to Support the Title IX Coordinator's Finding

114.   Pursuant to Ross University's sexual misconduct policy, the school could only find Doe responsible for the alleged violation based on the information in the investigatory file and utilizing the preponderance of the evidence standard.

115.   Ross University's promise of fundamental fairness and the implied covenant of good faith and fair dealing require that Doe have been presumed innocent and Ross University have the burden of proof. The records pertaining to Ross University's investigation and ultimate decision demonstrate that Ross University breached these obligations.

116.   When the hearing panel and decision-makers failed to consider the substantial amount of evidence supporting Doe's version of events, the obligation to consider all of the evidence was breached.

**Breach of the Obligation to Provide a Meaningful Right of Appeal.**

117.    Pursuant to Ross University's sexual misconduct policy, Doe had the right to submit an appeal of the determination of responsibility and any sanctions because of the presence of procedural errors, new information, an argument that the evidence does not support the determination, and/or an argument that the severity of the sanction imposed was inappropriate.

118.    Doe's appeal was based on all available grounds. Procedural errors were made when untrained personnel conducted the hearing and failed to consider Doe's evidence. New information came in the form of Doe's many reports and evidence of ZH's misconduct. There was nothing to support that ZH's version of events was more likely than Doe's, and the sanction was not only inappropriate, it was factually wrong.

119.    The manner in which the appeal was handled demonstrates that the appeal was a mere formality with no real evidence that the matter was reevaluated. Thus, Doe had no meaningful right to appeal.

120.    Upon information and belief, the Appellate Officers who considered Doe's appeal did not have training in adjudication; in the law; in the weighing of evidence; or in the relevance of irrelevance of types of evidence in the alleged sexual misconduct investigation setting.

121.    Despite the absence of any relevant training, the appellate officers wrongly concluded that no procedural errors, evidence of bias, relevant new information, or excessive severity had impacted or would impact the ultimate outcome and sanctions in Doe's case.

122.    Doe's "appeal" was illusory and a sham and breached the promise of fundamental fairness and the implied covenant of good faith and fair dealing.

## COUNT II PROMISSORY ESTOPPEL

123.    All of the foregoing paragraphs are incorporated by reference.

124. Promissory Estoppel exists when 1) Some form of legal relationship either exists or is anticipated between the parties, 2) the promise is given in circumstances that lead the other party to assume the promise will be performed, 3) reliance by the other party on the promise or representation, 4) the party must be in a worse position for having relied on the promise, and 5) the breaking of the promise resulting in detriment to the relying party is unfair or inequitable.

125. As described above, the Sexual Assault Policies and Procedures, Student Handbook, and other official University publications constitute representations and promises that the University intended to induce reliance, action, or forbearance on the part of John Doe. In reasonable reliance on these promises and representations, Doe accepted the University's offer of admission and incurred tuition and other expenses based on the University's promise that it would abide by its implied and express promises, including guarantees of due process and fundamental fairness, and the implied covenant of good faith and fair dealing.

126. To his detriment, Doe reasonably relied on the express and implied promises and representations made by the University.

127. As a direct and foreseeable result of the University's failure to honor its promises and representations, Doe has sustained and will continue to sustain substantial injury, damages, and losses. Doe's damages, injuries and losses include, but are not limited to: injury to reputation, severe emotional distress, past economic loss, future economic loss, loss of future career opportunities, loss of educational and extracurricular opportunities, and deprivation of due process.

128. Doe maintains that the sexual encounter at issue was entirely consensual, except that he was inebriated and thus is the victim because he was not capable of proper consent, and there was no blackmail ever intended or carried out. Ross had ample opportunity to know that Doe was the

victim of sexual misconduct, and after the reports and videos provided to Ross, all of ZH's actions became retaliatory and not an independent instance of misconduct by Doe.

## COUNT III – TITLE IX VIOLATIONS

129.    Title IX states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied benefits of, or be subjected to discrimination under any education program receiving Federal financial assistance . . ." 20 U.S.C. § 1681(a)

130.    20 U.S.C. § 1681(a). "Title IX is enforceable through a judicially implied private right of action, through which monetary damages are available." Klemencic v. Ohio State Univ., 263 F.3d 504, 510 (6th Cir. 2001). Standard of Review: A Title IX claim must allege 2016).

### Erroneous Outcome

131.    Doe has facts sufficient to cast articulable doubt on the accuracy of the outcome of the disciplinary proceeding as no exculpatory evidence or evidence favorable to him was considered.

132.    Public Records response (patterns of decision-making that tend to show the influence of gender) show a particularized causal connection between the flawed outcome and gender bias.

133.    The standard of a preponderance of the evidence used by Ross, from obsolete direction given in the "Dear Colleague" letter of 2011, was never met. Both parties were capable of testifying about their interactions and relationship. There is nothing in the record to suggest a reason why ZH was deemed more credible than Doe. Doe is presumed to be a more credible witness than ZH unless proven otherwise. He also reported her, with evidence, weeks before she ever reported him, and the school did nothing to stop her behavior. This in itself is a violation and shows bias. Once Ross was aware of the stalking and sexual harassment actions of ZH, they were required to act on it under Title IX, since the parties had a prior sexual history.

134. Doe asserts, and records support, that ZH was found to be more credible simply because she is a female and Doe is a male. In actuality ZH is less credible due to the inconsistency of her statements throughout the investigation and her continued stalking and sexual harassment. Even now ZH continues to violate the no contact order.

135. Doe was offered no assistance through the school nor was an advisor appointed by the school. He was not informed he could get an attorney and his medical school schedule did not allow for a lot of research on how to handle the matter. He reported it to the school, which is all he knew to do. ZH had assistance preparing witnesses, finding those witnesses, and preparing her statement. By providing assistance to ZH and not to Doe, Ross violated its policy.[8]

136. Doe was only allowed to view witness evidence the day of the hearing and had no opportunity to refute it or introduce evidence of his own.

137. He reported in 4-5 times in graphic detail what her actions were and when they had a sexual encounter, she never cancelled her consent and was the sober during their encounter. Doe was intoxicated.

138. Doe has a reasonable belief that records held by Ross will show that more females than males are believed, and more males than females receive disciplinary action.

139. Upon information and belief, a Public Records response would show a vast difference in the number of males found guilty of sexual assault vs. the number of females. There would also be a question of the number of females found to be lying in their accusations.

140. In Doe v. Miami[9], the Court stated that "Discovery may reveal that the alleged patterns of gender-based decision- making do not, in fact, exist. That information, however, is currently

---

[8] RUSM Student Handbook Excerpt Pages, Page 27
[9] Doe v. Miami University, No. 17-3396, 2018 WL 797451 (6th Cir. Feb. 9, 2018), Attached as Exhibit C

controlled by the defendants, and John has sufficiently pleaded circumstantial evidence of gender discrimination." Quoting *Brown Univ.*, 166 F. Supp. at 189; *Marshall v. Ind. Univ.*, 170 F. Supp. 3d 1201, 1210 (S.D. Ind. 2016).

**Selective Enforcement**

141.    Under the same expectation that documents held by the University will bear out the existence of a disproportionate number of males disciplined for sexual misconduct, Doe asserts that discovery will provide evidence of selective enforcement.

142.    Doe alleges that Ross engages in a pattern of disciplining only members of one sex and ignoring complaints of similar violations by the other sex.

143.    This allegation is borne out by the individual facts in this case, and discovery of patterns in the school's history will show that his is not an isolated incident.

**Deliberate Indifference**.

144.    Doe submits that Ross had an obligation to follow up and take action to aide him regardless of where the harassment occurred.[10]

145.    Doe submits that Ross responded with deliberate indifference *after* he reported the repeated sexual misconduct by ZH. No Title IX charge was ever initiated after multiple reports, videos and police reports showing evidence of her sexual misconduct, nor was Doe ever informed of his right to file a Title IX charge or advised that he was entitled to protection from the University.

146.    By knowingly permitting violations of Ross policy, known to Student Affairs and school investigators, Doe was effectively barred from access to his educational opportunities and benefits." *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 633 (1999); see also *Patterson v.*

---

[10] RUSM Student Handbook Excerpt Pages, Page 21

*Hudson Area Schs.*, 551 F.3d 438, 444–45 (6th Cir. 2009). Doe reported ZH dozens of times and he was completely ignored. ZH reported Doe one time and the school immediately deemed her credible, despite tremendous evidence, including her own conflicting testimony, that she was not.

147.    Ross, recipients of federal funds and therefore state actors, had actual knowledge of the policy violations sufficient to constitute "notice" that the proceedings against Doe were unfair, biased and/or not transparent.

148.    Doe has alleged facts showing a potential pattern of gender-based decision-making that raise a reasonable expectation that discovery will reveal circumstantial evidence of gender discrimination.

149.    Doe has created a plausible inference of intentional gender discrimination, sufficient to seek further evidence through the discovery process. *Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 505 (6th Cir. 2013).

150.    Ross viewed ZH as truthful when no objective evidence made her testimony or her witnesses more credible than Doe's. Given the current climate of the #MeToo culture, women are exceedingly likely to be assumed to be telling the truth when accusing a male of sexual misconduct. This underscored the importance of Doe's right to cross examine ZH and the fact that depriving Doe of this right was egregious.

**Hostile Environment**

151.    Doe has shown that his educational experience was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive [so as] to alter the conditions of the victim's" educational environment. Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)

152.     His trust in the school was destroyed, his ability to concentrate on his studies was seriously impaired, and he was financially hobbled by the suspension imposed upon him. Ross treated all of his concerns with indifference and a dismissive attitude.

153.     By failing to take his complaints seriously, failing to take any action against ZH and showing disregard for the effects of her harassment of him, Ross violated their statement that, "The richness of your different life experiences will not hinder your academic success as a student doctor at RUSM."[11] Again, Doe was promised that Ross' sexual misconduct policy would apply "to any alleged act of sex and/or gender-based misconduct that adversely impacts the RUSM community, whether those acts occur on or off campus."[12]

## Equal Protection

154.     Doe alleges that on more than one occasion Ross, state actors, intentionally treated him differently than females similarly situated without any rational basis for the difference.

155.     ZH was given access to far more assistance, information and material than was Doe, who has a Constitutional right to equal protection under the law when his fundamental rights were at stake.

156.     ZH was permitted to enter evidence which was then submitted to the hearing panel when that evidence had clearly been submitted after the deadline for submission of evidence. Radvansky v. City of Olmsted Falls, 395 F.3d 291, 312 (6th Cir. 2005).

157.     The law does not require that misconduct giving rise to a discriminatory outcome be of the same type and degree. Heyne, 655 F.3d at 571 Misconduct giving rise to expulsion need not be sexual misconduct. The degree of punishment for the seriousness of the offense can be compared.

---

[11] RUSM Student Handbook Excerpt Pages, Page 1
[12] RUSM Student Handbook Excerpt Pages, Page 21

158.    Doe alleges that the different treatment he received was based on "purposeful or intentional" gender discrimination. Smith v. City of Salem, 378 F.3d 566, 577 (6th Cir. 2004). Testimony in this case was a classic "he said, she said" and it is clear that no objective view of Student P's version of the events was more credible than Doe's.

## Substantive Due Process

159.    Doe's Constitutional guarantee of substantive-due-process rights were violated because he was deprived of two constitutionally protected property interests: a property interest in continuing his education and a property interest in a transcript "unmarred" by the finding of responsibility for sexual harassment or any action related to such.

## RELIEF REQUESTED

1.    WHEREFORE, Plaintiff prays for this judgment against Defendant Ross University School of Medicine and asks this Court to: Issue a judgment that that (a) declares Ross University's investigation and prosecution of the charges against Doe to contrary to Ross University's contractual and other obligations, its own rules and regulations and arbitrary and capricious and allow Doe to return to Ross immediately;

2.    Declare Ross University's student disciplinary process, including the sexual misconduct policy, as written and implemented and as applied to Doe, to be contrary to Title IX;

3.    Set aside the decision of Ross University as contrary to Ross University's own rules and regulations, contrary to law, arbitrary and capricious, and unsubstantiated by evidence;

4.    Allow Doe to immediately begin attending classes again so that he does not miss any time and be able to catch up in time to take exams for this semester and if he needs assistance in catching up, to provide such assistance;

5.    Require Ross University to expunge the entire incident at issue from its records;

6.     Award Doe compensatory damages in an amount to be determined at trial for mental anguish, severe emotional distress, injury to reputation, serious mental injury, past and future economic loss, deprivation of due process, loss of educational opportunities, loss of future career prospects, and other injuries proximately caused by Defendant Ross University;

7.     Award Doe his attorneys' fees, disbursements and costs pursuant to the provisions of 42 U.S.C. § 1988(b) relating to Title IX, or pursuant to any other statute or common law doctrine providing for the award of attorneys' fees, disbursements, and/or costs;

8.     Award prejudgment interest;

9.     Grant such further relief that this Court may deem just and proper.

Dated this the 31st day of December 2018.

Respectfully Submitted,

Michelle Owens
Agee Owens & Cooper Law 2911
Elm Hill Pike Nashville, TN 37214

## <u>CERTIFICATE OF SERVICE</u>

I certify that on December 31, 2018, the foregoing First Amended Complaint was served by the courts ECF filing system, U.S. Mail, or email on the following:

Leah Heinecke-Krumhus
Counsel for Ross University and
Adtlem 500 W. Monroe
Chicago, IL 60661
leah.heinecke-
krumhus@adtalem.com Counsel
for Defendant


_____
*/s/ Michelle Owens*

*Michelle Owens*