Exhibit C

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 18a0029p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

JOHN DOE,

              *Plaintiff-Appellant,*

    v.

MIAMI UNIVERSITY; STEVEN ELLIOT; ROSE MARIE WARD; ALANA VAN GRUNDY-YODER; JAYNE BROWNELL; SUSAN VAUGHN,

              *Defendants-Appellees.*

> No. 17-3396

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:15-cv-00605—Michael R. Barrett, District Judge.

Argued: November 29, 2017

Decided and Filed: February 9, 2018

Before: GUY, MOORE, and ROGERS, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Eric John Rosenberg, ROSENBERG & BALL CO. LPA, Granville, Ohio, for Appellant. Evan T. Priestle, TAFT STETTINIUS & HOLLISTER LLP, Cincinnati, Ohio, for Appellees. **ON BRIEF:** Eric John Rosenberg, ROSENBERG & BALL CO. LPA, Granville, Ohio, for Appellant. Evan T. Priestle, Doreen Canton, TAFT STETTINIUS & HOLLISTER LLP, Cincinnati, Ohio, for Appellees.

---

**OPINION**

---

KAREN NELSON MOORE, Circuit Judge.  In the fall of 2014, John Doe and Jane Doe[1] were students at Miami University, a public university located in Oxford, Ohio.  The two students knew each other and had engaged in several consensual "physical encounters."  This case arises from an incident between John and Jane on September 14, 2014.  Both parties had consumed alcohol, and John states that he was so intoxicated that he cannot remember what occurred.  According to Jane's statement, the two engaged in some consensual sexual acts, but at some point Jane stopped consenting and John continued to engage in then non-consensual sexual acts for some period of time before he stopped.  This accusation of sexual misconduct was evaluated by Miami University, and John was found responsible for violating the school's sexual-assault policy.  He was initially suspended for approximately eight months, but this suspension was reduced by the University on appeal to four months.  After the University's appeals process affirmed the original finding of responsibility, John brought suit against Jane, Miami University, and individual University employees who had been part of the disciplinary process.  John voluntarily dismissed his claims against Jane after the two parties reached a settlement.  The other defendants moved to dismiss John's six remaining claims under Title IX and § 1983 pursuant to Federal Rule of Civil Procedure 12(b)(6), and the district court granted their motion.

On appeal, John argues that the district court erred in granting the defendants' motion to dismiss.  We **AFFIRM** the district court's dismissal of John's Title IX hostile-environment claim, Title IX deliberate-indifference claim, and § 1983 substantive-due-process claim.  Furthermore, we **AFFIRM** in part and **REVERSE** in part the district court's dismissal of John's § 1983 procedural-due-process and equal-protection claims and related finding of qualified immunity.  We **REVERSE** the district court's holding that John did not sufficiently plead his

---

[1]The district court granted John's motion to allow the parties to use pseudonyms.  R. 49 (Dist. Ct. Order re Pseudonyms) (Page ID #3270).

Title IX erroneous-outcome claim.  We **REMAND** for further proceedings consistent with this opinion.

## I. BACKGROUND

On the evening of September 13, 2014, John and his roommate attended "a party where John Doe consumed approximately six beers."[2]  R. 39 (Am. Compl. ¶ 22) (Page ID #1977).  John then proceeded to "a bar and drank at least two more beers and four shots of alcohol before leaving the bar in the early morning hours of September 14, 2014."  *Id.*  At this point, John was sufficiently intoxicated that he cannot clearly remember what happened for the remainder of the night.  *Id.* ¶¶ 22, 24 (Page ID #1977, 1978).  Based on text messages he later found on his cellphone, John knows that he called Jane and "exchanged text messages with" her after he left the bar.  *Id.* ¶ 23 (Page ID #1978).

John recalls Jane getting into his bed some time before dawn on September 14.  *Id.* ¶ 24 (Page ID #1978).  His next memory is when he awoke the morning of September 14.  *Id.*  Jane was upset that her cellphone was "ruined."  *Id.* ¶ 25 (Page ID #1978).  "Because John Doe believed that he had been the last person to handle Jane Doe's phone, John Doe offered to buy her a new one."  *Id.*  During their trip to the store, Jane told John that "she was uncomfortable that he began to perform oral sex on" her.  *Id.* ¶ 26 (Page ID #1978).  John apologized for whatever he may have done, but informed Jane that he could not remember anything about his interactions with her the prior night.  *Id.*  "After John Doe purchased a new phone for Jane Doe, she told him that she forgave him and still wanted to be friends."  *Id.*

John attached to his complaint Jane's written statement about what occurred that night and stated that this is the only information he has about what happened besides his own incomplete recollection.  *Id.* ¶ 6 (Page ID #1975); R. 39-2 (Pl. Ex. 1: Jane Doe Statement) (Page ID #2036–37).  In her statement, Jane recalled that on the evening of September 13 she was out with a group of friends.  R. 39-2 (Pl. Ex. 1: Jane Doe Statement at 1) (Page ID #2036).  As she

---

[2]These facts are drawn from John Doe's amended complaint and attached exhibits.  R. 39 (Am. Compl.) (Page ID #1973–2028).  As this case is in front of us on an appeal from the district court's grant of the defendants' motion to dismiss, we presume all factual allegations in the complaint to be true at this stage of the proceedings.

and her friends walked back home, she ran into John and his roommate, whom Jane had previously dated. *Id.* Jane described herself as a "little drunk." *Id.* Jane and one of her friends returned to John and his roommate's dorm room. *Id.* Once there, Jane's friend told her that she was going to sleep in Jane's room that evening. *Id.* John and his roommate then offered to let Jane stay in their room, and she accepted. *Id.* In her statement, Jane then describes a sexual encounter with John that transitioned between consensual and non-consensual acts:

> I had made out with [John] a couple of times before then, so I decided to stay with them, I had just kind of assumed we might make out again. I did not know [his roommate] was going to stay there. At the time I thought I gave [my friend] my ID to get into my dorm to stay there. And she left. At this point I was kinda sobered up and thought [John] and [his roommate] were too. So they gave me a change of clothes and told me to pick a bed. I picked [John's] bed, because I thought that would be less weird. We got in bed and turned of [sic] the lights and we thought [the roommate] was asleep, [John] started kissing me and that was okay and what I expected and fine. He had asked me to do things before, and I had said no, and he had kept pressuring me to do things and I kept saying no, no, no. And he asked me again, if he could finger me and I said fine, because I was tired of him asking me. I am a virgin and Christian, and I don't do that. So he started doing that, and it was hurting. I said "[John] stop it is hurting." He said "Oh it will hurt at first, you will be fine in a couple of minutes." I said "Okay fine, whatever." It kept hurting and never got better. I kept saying stop and it hurts. [John] kept telling me to be quite [sic] because I would wake up [his roommate]. I finally got him to stop doing it, after telling him I pushed him away. We went back to kissing. He asked to eat me out. And I said no you are not doing that. We were kissing and then he just did it. I never said no. I pushed him away. He rolled over and went to sleep.

*Id.*

Jane discussed the incident with several of her friends. *Id.* at 2 (Page ID #2037); R. 39 (Am. Compl. ¶ 28) (Page ID #1979). One of her friends informed a Resident Advisor ("RA") that John had sexually assaulted Jane. R. 39 (Am. Compl. ¶ 28) (Page ID #1979). The RA informed her superiors at Miami about the alleged sexual assault and also expressed concern that John might harm himself because of the accusation. *Id.* ¶ 29 (Page ID #1979).

On September 16, 2014, Miami University's Associate Vice President and Dean of Students Michael Curme emailed John and informed him that the University had received a report that he had sexually assaulted another student two days before. R. 39-2 (Pl. Ex. 3: Summ.

Hr'g Notification at 4) (Page ID #2042). Curme told John that he was required to attend a summary suspension hearing the following day. *Id.* Following that hearing, the University imposed several restrictions on John, including one that prohibited him from contacting Jane. R. 39 (Am. Compl. ¶ 31) (Page ID #1980); R. 39-2 (Pl. Ex. 4: Summ. Hr'g Dec. at 5) (Page ID #2047).

On or about September 19, 2014, Miami University's Emergency Case Manager Tim Parsons met with John to explain the disciplinary process at Miami. R. 39 (Am. Compl. ¶ 34) (Page ID #1980). John applied for, and received, a Medical Leave of Absence from the University, effective September 23, 2014, because of his psychological distress resulting from the accusations. *Id.* ¶¶ 37–38 (Page ID #1981).

Also on September 23, 2014, defendant Susan Vaughn, the Director of the University's Office of Ethics and Student Conflict Resolution, provided John a Notice of Alleged Violation. *Id.* ¶ 39 (Page ID #1981); R. 39-2 (Pl. Ex. 6: Notice of Alleged Violation) (Page ID #2052). The notice informed John that there was an allegation that he had "sexually assaulted a female resident while both she and you were intoxicated." R. 39-2 (Pl. Ex. 6: Notice of Alleged Violation) (Page ID #2052). According to the notice, this was an alleged violation of Section 103 of Miami University's Student Conduct Regulations. *Id.*; R. 39-2 (Pl. Ex. 8: Miami Univ. Student Handbook at 39–40) (Page ID #2095–96). The notice informed John that he must attend a Procedural Review meeting the following day. R. 39 (Am. Compl. ¶ 39) (Page ID #1981). The purpose of the meeting was to review with John the alleged violation and potential consequences. R. 39-2 (Pl. Ex. 6: Notice of Alleged Violation) (Page ID #2052). At that meeting, John denied that he had committed a violation and requested that the violation be adjudicated by an Administrative Hearing Panel. R. 39 (Am. Compl. ¶ 43) (Page ID #1982).

On October 1, 2014, Procedural Hearing Officer Kelly Ramsey informed John and Jane that the hearing panel would convene on October 7. *Id.* ¶ 50 (Page ID #1984); R. 39-3 (Pl. Ex. 11: John Doe Notice of Hr'g at 1) (Page ID #2193); R. 39-3 (Pl. Ex. 12: Jane Doe Notice of Hr'g at 1) (Page ID #2196). Ramsey further informed John and Jane of the identity of the panel members and that objections to their inclusion based on bias could be filed by October 3. R. 39-3 (Pl. Ex. 11: John Doe Notice of Hr'g at 1) (Page ID #2193); R. 39-3 (Pl. Ex. 12: Jane Doe

Notice of Hr'g at 1) (Page ID #2196). The panel members were defendants Vaughn, Professor Alana Van Gundy-Yoder, and Professor Steve Elliott. *Id.* John alleges that he had insufficient time to investigate the proposed panel members and contest their inclusion before the deadline. R. 39 (Am. Compl. ¶ 52) (Page ID #1985). Ramsey also told John he had to submit a witness list, supporting documents, and any written statements by noon on October 3. R. 39-3 (Pl. Ex. 11: John Doe Notice of Hr'g at 1–2) (Page ID #2193–94). Jane received the same instructions. R. 39-3 (Pl. Ex. 12: Jane Doe Notice of Hr'g at 1) (Page ID #2196). The University did not, however, hold Jane to the October 3 deadline and allowed her to submit a written statement on October 6. R. 39 (Am. Compl. ¶ 51) (Page ID #1984–85).

Miami University held the Administrative Hearing Panel on October 7. *Id.* ¶ 55 (Page ID #1985). John alleges that he was not provided the names of the witnesses who testified against him prior to the hearing or a summary of their proposed testimony. *Id.* ¶ 57 (Page ID #1986). He also alleges that he was not given access to the disciplinary report compiling the evidence against him. *Id.* ¶ 102 (Page ID #2001). John describes Vaughn—who had been the person responsible for initially reviewing the evidence against him and choosing to pursue disciplinary action—as dominating the hearing and trying "to deflate John Doe's credibility while inflating Jane Doe's credibility." *Id.* ¶ 58 (Page ID #1986). John also describes Vaughn's body language during the hearing as "suggesting she believed John was lying" and alleges that she told him "I'll bet you do this [i.e., sexually assault women] all the time." *Id.* ¶ 66 (Page ID #1988–89).

The hearing panel found John responsible for violating Section 103 of the Student Conduct Regulations. *Id.* ¶ 61 (Page ID #1987); R. 39-3 (Pl. Ex. 15: Admin. Panel Hr'g Dec.) (Page ID #2233). The totality of the panel's fact-finding is reproduced below:

> You stated that you and [Jane] were friends and have spent time together in the past. Both of you agreed to go to your residence hall room, where you engaged in consensual kissing and some consensual sexual contact. However, at some point, [Jane] indicated she did not want to have oral sex and asked you to stop but the act continued.

R. 39-3 (Pl. Ex. 15: Admin. Panel Hr'g Dec.) (Page ID #2233). The panel sanctioned John by suspending him for three terms—fall, winter, and spring—until May 2015. R. 39 (Am. Compl. ¶ 61) (Page ID #1987); R. 39-3 (Pl. Ex. 15: Admin. Panel Hr'g Dec.) (Page ID #2233). Upon

John's re-enrollment, he was to be placed on disciplinary probation for one year.  R. 39-3 (Pl. Ex. 15: Admin. Panel Hr'g Dec.) (Page ID #2233).

On October 13, John appealed the hearing panel's decision to the Chair of the University Appeals Board, defendant Rose Marie Ward.  R. 39 (Am. Compl. ¶ 69) (Page ID #1989–90); R. 39-4 (Pl. Ex. 18: Oct. 13, 2014 Appeal Ltr.) (Page ID #2237–38).  On November 11, 2014, Ward informed John via letter that the University Appeals Board had denied his appeal.  R. 39 (Am. Compl. ¶ 73) (Page ID #1991); R. 39-4 (Pl. Ex. 20: Appeals Bd. Dec.) (Page ID #2242). John then appealed this decision to Vice President of Student Affairs, defendant Jayne Brownell. R. 39 (Am. Compl. ¶ 75) (Page ID #1991–92); R. 39-4 (Pl. Ex. 21: Nov. 14, 2014 Appeal Ltr.) (Page ID #2243–44).  Brownell affirmed the University Appeals Board's decision to uphold the hearing panel's finding of responsibility, but reduced his suspension period such that it ended on January 23, 2015.  R. 39 (Am. Compl. ¶ 77) (Page ID #1993); R. 39-4 (Pl. Ex. 23: Brownell Dec. at 1) (Page ID #2249).

John filed suit against the University and several individual defendants in the United States District Court for the Southern District of Ohio on September 17, 2015.  R. 1 (Complaint) (Page ID #1–55).  John voluntarily dismissed the two state-tort claims that he brought against Jane after the two parties reached a settlement.  R. 32 (Voluntary Dismissal) (Page ID #1873). The remaining defendants moved to dismiss all claims under Federal Rule of Civil Procedure 12(b)(6).  R. 42 (Mot. to Dismiss at 6) (Page ID #3139).  The district court granted the defendants' motion.  *Doe v. Miami Univ.*, 247 F. Supp. 3d 875, 896–97 (S.D. Ohio 2017).  John now appeals the district court's judgment with respect to Counts 3 through 7.

## II.  STANDARD OF REVIEW

We review de novo a district court's grant of a motion to dismiss for failure to state a claim.  *Jackson v. Ford Motor Co.*, 842 F.3d 902, 906 (6th Cir. 2016).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Id.* On a motion to dismiss, "[w]e must construe the complaint in the light most favorable to the plaintiff and accept all allegations as true." *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012).

We have previously applied the *Twombly*/*Iqbal* standard of pleading without modification in Title IX cases. *See, e.g., Tumminello v. Father Ryan High Sch., Inc.*, 678 F. App'x 281, 283–84 (6th Cir. 2017); *Doe v. Cummins*, 662 F. App'x 437, 443 (6th Cir. 2016). In other words, a complaint alleging Title IX violations must plead sufficient factual allegations to satisfy *Twombly* and *Iqbal*. *See Keys*, 684 F.3d at 609–10.

Nevertheless, John argues that we should adopt the Second Circuit's recent decision in *Doe v. Columbia University*, 831 F.3d 46 (2d Cir. 2016), which modified the pleading standard for Title IX claims. Appellant Br. at 28–34. In *Columbia University*, our sister circuit considered what a plaintiff asserting a Title IX claim must allege in order to plead sufficiently the required element of discriminatory intent. *Columbia Univ.*, 831 F.3d at 56. The Second Circuit analogized between what it required of plaintiffs in Title VII employment-discrimination cases and what it should require of plaintiffs alleging Title IX claims. *Id.* It concluded that a complaint under Title IX "is sufficient with respect to the element of discriminatory intent . . . if it pleads specific facts that support a minimal plausible inference of such discrimination." *Id.* This modified pleading standard "reduces the facts needed to be pleaded under *Iqbal*." *Id.* at 54 (quoting *Littlejohn v. City of New York*, 795 F.3d 297, 310 (2d Cir. 2015)).

Whatever the merits of the Second Circuit's decision in *Columbia University*, to the extent that the decision reduces the pleading standard in Title IX claims, it is contrary to our binding precedent. *Columbia University* is partially premised on the Second Circuit's decision in *Littlejohn*, 795 F.3d 297. In that case, the Second Circuit reconciled *Twombly* and *Iqbal* with the Supreme Court's holding in *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002), by holding that "[t]o the same extent that the *McDonnell Douglas* temporary presumption reduces the facts a plaintiff would need to show to defeat a motion for summary judgment prior to the defendant's furnishing of a non-discriminatory motivation, that presumption also reduces the facts needed to be pleaded under *Iqbal*." *Littlejohn*, 795 F.3d at 310. In contrast, we reconciled these cases differently in *Keys*, 684 F.3d at 609–10, and held that a plaintiff asserting a Title VII claim must

plead sufficient factual allegations to satisfy *Twombly* and *Iqbal* in alleging the required element of discriminatory intent.   Thus, the foundational analogy in *Columbia University* lacks support from our precedent.   Accordingly, in this Circuit, John must meet the requirements of *Twombly* and *Iqbal* for each of his claims in order to survive a Rule 12(b)(6) motion to dismiss.

### III.  TITLE IX CLAIMS

Title IX states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied benefits of, or be subjected to discrimination under any education program receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a).   "Title IX is enforceable through a judicially implied private right of action, through which monetary damages are available."  *Klemencic v. Ohio State Univ.*, 263 F.3d 504, 510 (6th Cir. 2001).

We have recognized, although never explicitly adopted in a published opinion, at least four theories of liability that a student who is "attacking a university disciplinary proceeding on grounds of gender bias," *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994), can potentially assert under Title IX.   These theories are:  (1) "erroneous outcome," (2) "selective enforcement," (3) "deliberate indifference," and (4) "archaic assumptions." *Cummins*, 662 F. App'x at 451–52 & n.9; *Mallory v. Ohio Univ.*, 76 F. App'x 634, 638–39 (6th Cir. 2003).   Here, John argues that the defendants are liable under Title IX under the first three of these theories, as well as under a hostile-environment theory.   The hostile-environment theory of liability has been recognized in other Title IX cases, *see, e.g.*, *Doe v. Claiborne Cty.*, 103 F.3d 495, 515 (6th Cir. 1996), although not one in which a student who was disciplined for sexual misconduct has brought suit against a university.

### A.  Count 3: Hostile Environment

In Counts 3 and 4 of his complaint, John alleges a violation of Title IX under a hostile-environment theory and a deliberate-indifference theory.   R. 39 (Am. Compl. ¶¶ 138–62) (Page ID #2012–19).   The district court analyzed both as asserting claims under the deliberate-indifference theory.   *Miami Univ.*, 247 F. Supp. 3d at 885 n.3.   While the district court was correct that John's allegations overlap substantially between Counts 3 and 4, a hostile-

environment claim and deliberate-indifference claim require the plaintiff to allege different elements.

A Title IX hostile-environment claim is analogous to a Title VII hostile-environment claim. *Claiborne Cty.*, 103 F.3d at 515; *see also Tumminello*, 678 F. App'x at 284. Under this theory of liability, the plaintiff must allege that his educational experience was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive [so as] to alter the conditions of the victim's" educational environment. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citations and quotation marks omitted).

John argues that his allegations of gender bias in the University's sexual-assault disciplinary process suffice to constitute a viable hostile-environment claim. Appellant Br. at 35. John does not allege facts that support a reasonable inference that his educational experience was "permeated with discriminatory intimidation, ridicule, and insult." *Harris*, 510 U.S. at 21 (citation and internal quotation marks omitted). Thus, we affirm the district court's grant of the defendants' motion to dismiss as to Count 3. *Cf. La. Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 477 (6th Cir. 2010) (stating that on de novo review of a district court's grant of a motion to dismiss, this court "may affirm the judgment of the district court on any ground supported by the record").

## B. Count 4: Deliberate Indifference

John's second theory of Title IX liability is deliberate indifference: He argues that the University was deliberately indifferent to the gender discrimination that he faced during the disciplinary process and the sexual misconduct perpetrated against him by Jane. Appellant Br. at 35–36. Under the deliberate-indifference theory, a plaintiff must "demonstrate that an official of the institution who had authority to institute corrective measures had actual notice of, and was deliberately indifferent to, the misconduct." *Mallory*, 76 F. App'x at 638. Furthermore, a deliberate-indifference claim premised on student-on-student misconduct must allege "harassment that is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Davis v. Monroe Cty. Bd. of Educ.*,

526 U.S. 629, 633 (1999); *see also Patterson v. Hudson Area Schs.*, 551 F.3d 438, 444–45 (6th Cir. 2009).

In *Mallory*, we did not explicitly state whether a deliberate-indifference claim in this context requires the plaintiff to plead that the misconduct alleged is sexual harassment, because we only assumed arguendo that this theory applied. *Mallory*, 76 F. App'x at 638–39; *see also Cummins*, 662 F. App'x at 451 n.9 (declining to decide whether the deliberate-indifference theory was applicable to this kind of case because the plaintiff did not argue that it was).[3] John asserts no rationale why deliberate-indifference claims in this kind of case do not require allegations of sexual harassment when such an allegation is a required element of a prima facie case of deliberate indifference in other Title IX cases. *See Horner v. Ky. High Sch. Athletic Ass'n*, 206 F.3d 685, 691–93 (6th Cir. 2000) (summarizing the three Supreme Court cases that articulate the deliberate-indifference theory of liability in Title IX cases and noting that "all address deliberate indifference to sexual harassment"); *Doe v. Univ. of the South*, 687 F. Supp. 2d 744, 758 (E.D. Tenn. 2009) (dismissing a plaintiff's Title IX deliberate-indifference claim because he "fail[ed] to allege any facts to support a finding that the University's actions were at all motivated by [his] gender or sex or constituted gender harassment or sexual harassment"). *But see Plummer v. Univ. of Houston*, 860 F.3d 767, 778 (5th Cir. 2017) (dismissing plaintiffs' deliberate-indifference claim, but implying that the misconduct need not be sexual harassment, but rather could be constitutional deficiencies in the disciplinary process). Thus, to plead sufficiently a Title IX deliberate-indifference claim the misconduct alleged must be sexual harassment.

John's argument, therefore, that he has sufficiently alleged a deliberate-indifference claim based solely on the gender discrimination he asserts occurred throughout the disciplinary process, Appellant Br. at 35–36, fails because the alleged gender discrimination is not tethered to a claim of sexual harassment. John, however, also argues that the defendants were deliberately

---

[3] The Fifth Circuit has recognized deliberate indifference as a theory of liability, as have lower courts in this Circuit. *Plummer v. Univ. of Houston*, 860 F.3d 767, 777 (5th Cir. 2017) (implicitly recognizing that plaintiffs could allege a deliberate-indifference claim by holding that their pleading of this claim was insufficient); *Wells v. Xavier Univ.*, 7 F. Supp. 3d 746, 752 (S.D. Ohio 2014); *Doe v. Univ. of the South*, 687 F. Supp. 2d 744, 757–58 (E.D. Tenn. 2009).

indifferent to the sexual misconduct that Jane perpetrated against him.  Appellant Br. at 36.  The district court rejected this argument because John did not allege that he had initiated his own sexual-misconduct complaint against Jane and only one incident of sexual misconduct does not rise to the level of being "severe, pervasive, and objectively offensive."  *Miami Univ.*, 247 F. Supp. 3d at 886.

The district court was incorrect to suggest that John needed to have made a formal complaint about Jane in order to plead a deliberate-indifference claim.  We require only that "the funding recipient had actual knowledge of the sexual harassment," and not that the plaintiff followed a formal procedure to put the funding recipient on notice.  *Patterson*, 551 F.3d at 445.  The University did have actual knowledge that Jane had kissed John while John was so intoxicated that he could not remember the events of the night the next morning—indicating that John was inebriated to the extent that he could not consent under Miami University's policies.[4] R. 39-2 (Pl. Ex. 1: Jane Doe Statement at 1) (Page ID #2036); R. 39-2 (Pl. Ex. 6: Notice of Alleged Violation) (Page ID #2052).  Thus, John's failure to initiate his own complaint against Jane for her sexual misconduct has no impact on the actual knowledge of the defendants.[5]

However, one incident of allegedly non-consensual kissing—while unacceptable—does not rise to the level of "sexual harassment [that is] so severe, pervasive, and objectively offensive that it could be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school."  *Patterson*, 551 F.3d at 444–45.  Rather, we have required a plaintiff alleging deliberate indifference to establish an extensive pattern of sexually offensive behavior, and this one incident of kissing is insufficient.  *Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356, 360, 363 (6th Cir. 2012) (holding that three separate occasions of sexual harassment—a male student shoving a female student into a locker, demanding that she perform oral sex on him, and making obscene sexual gestures at her—did not constitute sexual harassment that rose to the

---

[4]Miami University's Student Handbook states that "[a]n individual cannot consent who is substantially impaired by any drug or intoxicant . . . ."  R. 39-2 (Pl. Ex. 8: Miami Univ. Student Handbook at 39–40) (Page ID #2095–96).

[5]It also appears that Jane did not initiate a formal complaint herself, but rather Jane's friend reported the alleged sexual misconduct.  R. 39-2 (Pl. Ex. 1: Jane Doe Statement at 2) (Page ID #2037).

level of "severe, pervasive, and objectively offensive"). Thus, we affirm the district court's judgment with respect to John's Title IX deliberate-indifference claim.

## C. Count 5: Erroneous Outcome

Count 5 of John's complaint alleges that Miami University violated Title IX under an erroneous-outcome theory of liability. R. 39 (Am. Compl. ¶¶ 169–76) (Page ID #2019–21). To plead an erroneous-outcome claim, a plaintiff must allege: "(1) 'facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding' and (2) a 'particularized . . . causal connection between the flawed outcome and gender bias.'" *Cummins*, 662 F. App'x at 452 (quoting *Yusuf*, 35 F.3d at 715). The district court held that John had alleged sufficient facts to "cast doubt on the accuracy of the outcome of the Administrative Hearing." *Miami Univ.*, 247 F. Supp. 3d at 886. The district court, however, held that John had not sufficiently pleaded the second part of an erroneous-outcome claim: causation between the disciplinary proceeding's outcome and gender bias. *Id.* at 889–90. Thus, the district court held that John had failed to state a claim under Title IX based on an erroneous-outcome theory. *Id.* at 890.

We agree with the district court that John has pleaded sufficient facts to cast "some articulable doubt on the accuracy" on the outcome of his disciplinary hearing. He alleges that he was so intoxicated that he cannot recall the critical events in question. R. 39 (Am. Compl. ¶¶ 6, 22) (Page ID #1975, 1977). Thus, John's only knowledge of what occurred is drawn from Jane's description. *Id.* ¶ 6 (Page ID #1975). In her written statement, Jane describes a series of sexual acts between herself and John, some of which were consensual and some of which were not. R. 39-2 (Pl. Ex. 1: Jane Doe Statement at 1) (Page ID #2036). She states that she initially agreed to digital penetration, but at some point told John to stop. *Id.* John did stop, but only after some period of time had passed. *Id.* Then John asked Jane if he could engage in oral sex. *Id.* According to Jane, she said no, but John proceeded anyway and Jane responded by pushing him away, rather than re-verbalizing her denial of consent. *Id.* John then stopped. *Id.* Jane also states, however, that "I never said no." *Id.*

The Administrative Hearing Panel found John responsible for sexual misconduct on the basis of the following finding of fact: "However, at some point, [Jane] indicated she did not want to have oral sex and asked you to stop but the act continued." R. 39-3 (Pl. Ex. 15: Admin. Panel Hr'g Dec.) (Page ID #2233). This one-sentence finding of misconduct holds John responsible for non-consensual oral sex only, and not non-consensual digital penetration. But Jane's statement is internally inconsistent with regard to her description of the oral sex: she states both that "I said no" and "I never said no." R. 39-2 (Pl. Ex. 1: Jane Doe Statement at 1) (Page ID #2036). The Administrative Hearing Panel does not explain how it resolved this inconsistency. Additionally, the panel's terse statement does not elucidate why it found the oral sex to be non-consensual when it appears to have found that the digital penetration was consensual. Furthermore, John alleges that Vaughn, a hearing-panel member, was mistaken about the applicable standard of consent, and that she erroneously believed Miami University required affirmative consent, as evidenced by a quote attributed to Vaughn explaining the University's policy in a local newspaper article. R. 39 (Am. Compl. ¶ 108) (Page ID #2004); R. 41 (Pl. Ex. 59: Dayton Daily News Article) (Page ID #2804). Affirmative consent is a more stringent requirement than what is actually articulated in the University's Title IX policy and student handbook. R. 39-2 (Pl. Ex. 8: Miami Univ. Student Handbook at 39) (Page ID #2095); R. 39-2 (Pl. Ex. 9: Miami Univ. Title IX Policy at 3–4) (Page ID #2170–71). At the motion-to-dismiss stage, where all reasonable inferences must be drawn in favor of the plaintiff, the unresolved inconsistency in Jane's statement, the unexplained discrepancy in the hearing panel's finding of fact, and the alleged use of an erroneous definition of consent creates "some articulable doubt" as to the accuracy of the decision.

In order to survive a motion to dismiss on this claim, John must also allege facts showing "a 'particularized . . . causal connection between the flawed outcome and gender bias.'" *Cummins*, 662 F. App'x at 452 (quoting *Yusuf*, 35 F.3d at 715). "Such allegations might include, inter alia, statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Yusuf*, 35 F.3d at 715. The district court concluded that John had not sufficiently pleaded this second part of his claim. *Miami Univ.*, 247 F. Supp. 3d at 890. We disagree.

Taken together, the statistical evidence that ostensibly shows a pattern of gender-based decision-making and the external pressure on Miami University supports at the motion-to-dismiss stage a reasonable inference of gender discrimination.[6]  John alleges facts showing a potential pattern of gender-based decision-making that "raise a reasonable expectation that discovery will reveal" circumstantial evidence of gender discrimination.  *See Twombly*, 550 U.S at 556.  He asserts that every male student accused of sexual misconduct in the Fall 2013 and Spring 2014 semesters was found responsible for the alleged violation, R. 39 (Am. Compl. ¶ 151) (Page ID #2016), and that nearly ninety percent of students found responsible for sexual misconduct between 2011 and 2014 have male first-names, *Id.*; R. 40-4 (Pl. Ex. 42: Public Record Request of Sexual Misconduct Violations) (Page ID #2613) (listing twenty students' first-names, only two of which are traditionally female names).  Additionally, John incorporated an affidavit from an attorney who represents many students in Miami University's disciplinary proceedings, which describes a pattern of the University pursuing investigations concerning male students, but not female students.  R. 39 (Am. Compl. ¶ 85) (Page ID #1996); R. 41–5 (Pl. Ex. B: Meloy Affidavit at 1–2) (Page ID #3132–33).  Lastly, John points to his own situation, in which the University initiated an investigation into him but not Jane, as evidence that Miami University impermissibly makes decisions on the basis of a student's gender.  R. 39 (Am. Compl. ¶¶ 80–83) (Page ID #1994–95).  Discovery may reveal that the alleged patterns of gender-based decision-making do not, in fact, exist.  That information, however, is currently controlled by the defendants, and John has sufficiently pleaded circumstantial evidence of gender discrimination. *See Brown Univ.*, 166 F. Supp. at 189; *Marshall v. Ind. Univ.*, 170 F. Supp. 3d 1201, 1210 (S.D. Ind. 2016).

---

[6]We do not rely on John's allegation that Van Gundy-Yoder, one of the members of the Administrative Hearing Panel, is biased against men because she researches "feminist criminological theory" and is affiliated with the Women's, Sexuality, and Gender Studies program at Miami University, R. 39 (Am. Compl. ¶ 54) (Page ID #1985), or that Ward, the chair of the University Appeals Board, was motivated by gender bias because her "research focuses on student alcohol consumption and sexual assault from the perspective of protecting females from males," *id.* ¶ 74 (Page ID #1991).  Merely being a feminist, being affiliated with a gender-studies program, or researching sexual assault does not support a reasonable inference than an individual is biased against men.  Nor do we rely on Vaughn's statements and body language at the hearing, *id.* ¶ 66 (Page ID #1988–89), which do not support an inference that she was motivated by biases against men as a group.

John also asserts that Miami University faced external pressure from the federal government and lawsuits brought by private parties that caused it to discriminate against men. Specifically, he argues that pressure from the government to combat vigorously sexual assault on college campuses and the severe potential punishment—loss of all federal funds—if it failed to comply, led Miami University to discriminate against men in its sexual-assault adjudication process. R. 39 (Am. Compl. ¶¶ 76, 86–92) (Page ID #1992–93, 1996–98); R. 40 (Pl. Ex. 30: White House "Not Alone" Report at 17) (Page ID #2315); R. 40–2 (Pl. Ex. 32: Miami Univ. Training at 49–54) (Page ID #2504–09); R. 39-4 (Pl. Ex. 22: ATIXA Tip of the Week Apr. 24, 2014 at 1–2) (Page ID #2245–46); *see also* "Dear Colleague" Letter from Russlynn Ali, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ. (Apr. 4, 2011), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf; Emma Ellman-Golan, Note, *Saving Title IX: Designing More Equitable and Efficient Investigation Procedures*, 116 MICH. L. REV. 155, 162–66, 173–74 (2017). Additionally, John contends that Miami University was facing pressure to increase the zealousness of its "prosecution" of sexual assault and the harshness of the sanctions it imposed because it was a defendant in a lawsuit brought by a student who alleged that she would not have been assaulted if the University had expelled her attacker for prior offenses. R. 39 (Am. Compl. ¶100) (Page ID #2000–01); R. 40-4 (Pl. Ex. 43: Media Reports of Lawsuit at 5–7) (Page ID #2618–2620); R. 40-4 (Pl. Ex. 44: 2013 Lawsuit against Miami Univ.) (Page ID #2621–61).

Considering all of these factual allegations relating to Miami University's pattern of activity respecting sexual-assault matters and the asserted pressures placed on the University, John has pleaded sufficient specific facts to support a reasonable inference of gender discrimination. At the pleading stage, John's allegations need only create the plausible inference of intentional gender discrimination; although alternative non-discriminatory explanations for the defendants' behavior may exist, that possibility does not bar John's access to discovery. *See 16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 505 (6th Cir. 2013) ("[T]he mere existence of more likely alternative explanations does not automatically entitle a defendant to dismissal); *Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*, 648 F.3d 452, 458 (6th Cir. 2011) ("Often, defendants' conduct has several plausible explanations. Ferreting out the most likely reason for the defendants' actions is not appropriate at the pleadings stage.").

Consequently, we reverse the district court's grant of the defendants' motion to dismiss Count 5 of John's complaint and remand for further proceedings.

### D.  Selective Enforcement

In his appellate brief, John argues in passing that he sufficiently alleged a Title IX claim premised on the theory of selective enforcement.  Appellant Br. at 18–19.  John did not assert this as a theory of liability in his complaint or in his opposition to the defendants' motion to dismiss.  To the extent that John is now trying to assert a Title IX selective-enforcement claim, he has forfeited this argument.  *Guyan Int'l, Inc. v. Prof'l Benefits Adm'rs, Inc.*, 689 F.3d 793, 799 (6th Cir. 2012) ("If a party fails to raise an issue to the district court, then that party 'forfeits the right to have the argument addressed on appeal.'" (quoting *Armstrong v. City of Melvindale*, 432 F.3d 695, 699–700 (6th Cir. 2006))).

## IV.  SECTION 1983 CLAIMS

John brought claims pursuant to 42 U.S.C. § 1983 against the individual defendants in their official capacities for injunctive relief and in their personal capacities for monetary damages.  R. 39 (Am. Compl. ¶¶ 177–207) (Page ID #2021–26).  He alleges that the individual defendants violated the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment.  *Id.*  The district court held that John had failed to state a claim under either of these clauses and granted the defendants' motion to dismiss.  *Miami Univ.*, 247 F. Supp. 3d at 891, 895, 896.  The district court also held that the individual defendants were entitled to qualified immunity.  *Id.* at 896.

"To state a claim under 42 U.S.C. § 1983, a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law."  *Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 562 (6th Cir. 2011) (quoting *Marvin v. City of Taylor*, 509 F.3d 234, 243 (6th Cir. 2007)).  Here, the defendants do not dispute that they were acting under the color of state law; thus, the issue is whether John has sufficiently alleged that he has been deprived of a constitutional right.  Because part of John's due-process claim is premised on

his equal-protection claim, we will address the two counts in the opposite order from how they are presented in his complaint.

## A.  Count 7: Equal Protection

To establish an equal-protection violation, a plaintiff must allege that the state made a distinction which "burden[ed] a fundamental right, target[ed] a suspect class, or intentionally treat[ed] one differently from others similarly situated without any rational basis for the difference."  *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 312 (6th Cir. 2005).  John alleges three instances when the defendants treated him differently from those similarly situated without any rational basis for the treatment.  Only the last of the three asserted occasions of differential treatment sustains a viable-equal protection claim.

First, John argues that he faced unequal treatment because Jane was given "limited amnesty" for underage drinking.  Appellant Br. at 39–40.  Although the district court considered this an allegation of unequal treatment, *Miami Univ.*, 247 F. Supp. 3d at 895–96, John's complaint does not support his argument that he faced an unequal application of Miami University's policy against underage drinking.  John asserts that Jane received "limited amnesty" for her violation of the prohibition on underage drinking, R. 39 (Am. Compl. ¶ 49) (Page ID #1983–84), but he does not allege that the University proceeded against him for violating the underage drinking policy.  John was found responsible by the University for sexual misconduct, not underage drinking.  R. 39-3 (Pl. Ex. 15: Admin. Panel Hr'g Dec.) (Page ID #2233).  The grant of "limited amnesty" to one student who admitted underage drinking and the non-prosecution of another student who also admitted underage drinking does not give rise to a claim of unequal treatment in violation of the Equal Protection Clause.

Second, John alleges that Jane was allowed to submit her written statement on October 6, 2014, three days after the deadline that the University had stated.  R. 39 (Am. Compl. ¶ 51) (Page ID #1984–85).  John does not, however, allege that he attempted to submit materials after the deadline, much less that the University refused to accept such materials or would not have provided an extension to him as well.  Thus, John's allegations do not give rise to a reasonable inference that he faced unequal treatment.

Lastly, John argues that the defendants' failure to discipline Jane for sexual misconduct, when he faced discipline, was unequal treatment.  Appellant Br. at 40; R. 39 (Am. Compl. ¶ 65) (Page ID #1988).  The gravamen of John's argument is that Miami University, acting through Vaughn, pursued disciplinary action against him because he was a man, whereas it did not do so with respect to Jane because she was a woman.[7]  Appellant Reply Br. at 4.  In order to plead this claim sufficiently, John must allege that Vaughn was operating under "the same set of operative facts" when she decided not to initiate the disciplinary process against Jane.  *Doe v. Ohio State Univ.*, 239 F. Supp. 3d 1048, 1083 (S.D. Ohio 2017); *see also Perry v. McGinnis*, 209 F.3d 597, 601 (6th Cir. 2000) (holding that for individuals to be similarly situated there must be "relevant similarity," but there need not be "exact correlation").

Vaughn, the individual allegedly responsible for deciding whether or not to charge students with sexual-misconduct violations, R. 39 (Am. Compl. ¶ 58) (Page ID #1986), had received a report that John had engaged in non-consensual sexual acts against Jane.  R. 39-2 (Pl. Ex. 6: Notice of Alleged Violation) (Page ID #2052).  Vaughn also allegedly knew that Jane had engaged in non-consensual sexual acts against John, when John was so intoxicated he was unable to provide consent—as defined by Miami University's consent policy—and Jane had "kinda sobered up."  R. 39 (Am. Compl. ¶¶ 24, 63) (Page ID #1978, 1988); R. 39-2 (Pl. Ex. 6: Notice of Alleged Violation) (Page ID #2052); R. 39-2 (Pl. Ex. 8: Miami Univ. Student Handbook at 39–40) (Page ID #2095–96); R. 39-2 (Pl. Ex. 1: Jane Doe Statement at 1) (Page ID #2036).  The non-consensual acts Jane allegedly perpetrated—kissing John—are a type of prohibited sexual misconduct under the University's policies.  R. 39-2 (Pl. Ex. 1: Jane Doe Statement at 1) (Page ID #2036); R. 39-2 (Pl. Ex. 9: Miami Univ. Title IX Policy at 3) (Page ID #2170).  Thus, Vaughn knew that Jane had potentially violated the University's sexual misconduct provisions at the same time she reviewed the allegations against John.  Neither Jane nor John initiated a formal complaint themselves regarding the other's conduct, R. 39-2 (Pl. Ex. 1: Jane Doe Statement at 2) (Page ID #2037), but Vaughn chose to pursue disciplinary action against John, but not Jane.

---

[7]John does not allege that the other individual defendants—Van Gundy-Yoder, Elliott, Ward, and Brownell—had any role in deciding whether to pursue disciplinary action against Jane.  We focus, therefore, on Vaughn's alleged conduct.

These alleged facts sufficiently show at the motion-to-dismiss stage that John and Jane were similarly situated. Vaughn had credible information that both students had potentially violated the University's sexual misconduct policy. Vaughn, however, chose not to pursue disciplinary action against the female student, but only against the male student. We note that the exact alleged sexual misconduct of each student is not the same. John, while extraordinarily inebriated, apparently engaged in non-consensual digital penetration and oral sex. Jane, apparently mostly sober, purportedly kissed John when he was incapacitated and unable to consent. But we have not previously required a plaintiff to allege that the misconduct giving rise to an allegedly discriminatory disciplinary outcome be of the same type and degree. *See Heyne*, 655 F.3d at 571 (holding that the plaintiff sufficiently pleaded an equal-protection claim when he alleged that he was punished more harshly for running over another student's foot with his vehicle than the other student was for threatening the plaintiff's life because of the different races of the two students).

The instance of unequal treatment that John sufficiently pleads arises out of Vaughn's failure to initiate the University's disciplinary process with respect to Jane after receiving credible information that Jane may have violated the sexual-misconduct policy. *Cf. Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736 (9th Cir. 2000) (affirming the grant of summary judgment for the defendants on plaintiffs' § 1983 equal-protection claim when the asserted disparate treatment was that the female plaintiffs were suspended after being caught violating the school rules, whereas the male students were not punished because the school had no notice of misconduct on their part). But equal protection does not require John and Jane to have received the same sanctions when the underlying alleged misconduct of the two was different; if Miami University had initiated disciplinary proceedings against Jane, this process may have led to a finding of not responsible or the imposition of a lesser sanction. None of these hypotheticals, unless impermissibly motivated by gender, would establish an equal-protection violation.

John must also allege that the different treatment he received was based on "purposeful or intentional" gender discrimination. *Smith v. City of Salem*, 378 F.3d 566, 577 (6th Cir. 2004). John asserts the same facts that undergirded his Title IX claims of gender discrimination to buttress his § 1983 claim. Appellant Br. at 40. For the same reasons that we held that John had

sufficiently pleaded facts demonstrating discriminatory intent under his Title IX erroneous-outcome claim, John has alleged sufficient facts to show circumstantial evidence of gender discrimination with respect to his equal-protection claim. *See* Section III.C *supra*.

"[C]onstru[ing] the complaint in the light most favorable to the plaintiff," *Keys*, 684 F.3d at 608, John has sufficiently pleaded an equal-protection claim. Of course this case is before us at the motion-to-dismiss stage, and discovery may disprove John's allegation that the reason he was treated differently than Jane was because of his gender and not because of other, legitimate reasons. But given the procedural posture in which the case currently stands, however, we must presume John's allegations to be true.

Thus, we reverse the district court's grant of the defendants' motion to dismiss Count 7 with respect to Vaughn and remand for further proceedings. As the remaining individual defendants—Van Gundy-Yoder, Elliott, Ward, and Brownell—played no role in the decision to initiate disciplinary proceedings against John, but not Jane, we affirm the district court's grant of the defendants' motion to dismiss Count 7 with respect to them.

## B. Count 6: Substantive Due Process

Substantive-due-process claims are "loosely divided into two categories: (1) deprivations of a particular constitutional guarantee; and (2) actions that shock the conscience." *Valot v. Southeast Local Sch. Dist. Bd. of Educ.*, 107 F.3d 1220, 1228 (6th Cir. 1997) (internal quotation marks omitted). Here, John has pleaded both types of substantive-due-process claims.

### 1. Deprivation of Constitutional Guarantee

In his complaint, John alleges that his substantive-due-process rights were violated because he was deprived of two constitutionally protected property interests: a property interest in continuing his education and a property interest in a transcript "unmarred" by the finding of responsibility for sexual misconduct. R. 39 (Am. Compl. ¶¶ 182, 197) (Page ID #2021, 2024). In his response to the defendants' motion to dismiss before the district court and in front of this court, John has asserted only his property interest in continuing his education. R. 25 (Dist. Ct. Op. at 22) (Page ID #3592); Appellant Br. at 41.

"As an initial matter, we note that the Supreme Court never has held that the interest in continued education at a public university constitutes a fundamental property or liberty interest that finds refuge in the substantive protections of the Due Process Clause." *Martinson v. Regents of Univ. of Mich.*, 562 F. App'x 365, 375 (6th Cir. 2014). "[O]ur own precedent suggests that the opposite is true," although this court has not definitively decided the issue. *Id.* A consensus on this issue does not appear to have emerged among our sister circuits either. *See, e.g.,* *Williams v. Wendler*, 530 F.3d 584, 589 (7th Cir. 2008) (holding that a suspension from a public university is not a deprivation of constitutional property); *Butler v. Rector & Bd. of Visitors of Coll. of William & Mary*, 121 F. App'x 515, 518–19 (4th Cir. 2005) (assuming, without deciding, that a student had "a property interest in continued enrollment" in a master's program "that is protected by the Due Process Clause").

In *Bell v. Ohio State University*, 351 F.3d 240, 251 (6th Cir. 2003), we held that, because a medical student had not established that her expulsion from medical school was an equal-protection violation, "we c[ould] see no basis for finding that [her] interest in continuing her medical school education is protected by substantive due process." *See also Rogers v. Tenn. Bd. of Regents*, 273 F. App'x 458, 463 (6th Cir. 2008). The holding in *Bell* relied on our earlier decision in *Gutzwiller v. Fenik*, 860 F.2d 1317, 1329 (6th Cir. 1988), where we noted that in "certain situations . . . a violation of one [clause] will constitute a violation of the other."

John relies on *Bell* to argue that because he has asserted an equal-protection violation, he has sufficiently pleaded a substantive-due-process violation. Appellant Br. at 42; Appellant Reply Br. at 23. But "[t]he spheres of protection offered by the two concepts [equal protection and substantive due process] are not, to be sure, coterminous." *Gutzwiller*, 860 F.2d at 1328. For a substantive-due-process claim to lie, the interest that John allegedly was deprived of must fall within the ambit of substantive due process. *Id.* at 1329. Here, John offers no argument for why we should recognize an independent property interest in pursuing a post-secondary education continuously, free from a suspension of less than four months. *Cf. Bell*, 351 F.3d at 249–50 ("The interests protected by substantive due process are of course much narrower than those protected by procedural due process. . . . [Substantive due process] protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and

tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed."). On the alleged facts and arguments presented to us in this case, John has not sufficiently pleaded a substantive-due-process claim premised on a deprivation of a constitutionally protected guarantee.

### 2. Actions that "Shock the Conscience"

John also alleges that the defendants violated the substantive component of the Due Process Clause because they engaged in an "arbitrary abuse of executive power so egregious that it shocks the conscience of the public." R. 39 (Am. Compl. ¶ 190) (Page ID #2023). The district court held that John had forfeited this argument because he did not raise it in his opposition to the defendants' motion to dismiss. R. 25 (Dist. Ct. Op. at 22) (Page ID #3592). John vigorously contests the district court's conclusion that he has abandoned this part of his substantive-due-process claim. Appellant Br. at 41 & n.11. But even if John has not forfeited this claim, he cannot survive a motion to dismiss on this claim.

Executive action shocks the conscience when it is "arbitrary, or conscience shocking, in a constitutional sense." *Handy-Clay v. City of Memphis*, 695 F.3d 531, 547 (6th Cir. 2012) (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998)). "Moreover, this characterization applies to only the most egregious official conduct, conduct that is so brutal and offensive that it [does] not comport with traditional ideas of fair play and decency." *Id.* at 547–48 (alteration in original) (internal citations and quotation marks omitted). Even viewing John's complaint in the most favorable light, the defendants' alleged actions do not constitute constitutionally arbitrary or conscience-shocking conduct. *See, e.g.*, *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 643 (6th Cir. 2005) (describing an example of conscience-shocking conduct drawn from a case in which two African-American students were expelled from Alabama State College, without notice or a hearing, "for seeking to purchase lunch at a publicly owned grill in the basement of the Montgomery, Alabama, county courthouse" (citing *Dixon v. Ala. State Bd. of Educ.*, 294 F.2d 150 (5th Cir. 1961))).

"Where government action does not deprive a plaintiff of a particular constitutional guarantee or shock the conscience, that action survives the scythe of substantive due process so

long as it is rationally related to a legitimate state interest." *Valot*, 107 F.3d at 1228. Here, the defendants' imposition of sanctions on John is rationally related to Miami University's legitimate interest in investigating alleged violations of its student code of conduct and disciplining those found responsible. Consequently, we affirm the district court's grant of the defendants' motion to dismiss with respect to John's § 1983 substantive-due-process claim.

## C. Count 6: Procedural Due Process

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). Procedural due process is "implicated by higher education disciplinary decisions." *Flaim*, 418 F.3d at 633; *see also Doe v. Univ. of Cincinnati*, 872 F.3d 393, 399 (6th Cir. 2017). "Suspension 'clearly implicates' a protected property interest, and allegations of sexual assault may 'impugn [a student's] reputation and integrity, thus implicating a protected liberty interest.'" *Univ. of Cincinnati*, 872 F.3d at 399 (quoting *Cummins*, 662 F. App'x at 445).

Because John's suspension implicates a constitutionally protected interest, "the question remains what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972); *see also Univ. of Cincinnati*, 872 F.3d at 399. We evaluate the nature of the procedure that is due under the three-factor framework articulated by the Supreme Court in *Mathews*, 424 U.S. at 334–35; *see also Flaim*, 418 F.3d at 634. These "three distinct factors" are: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335.

The private interest at stake in this case is substantial. "A finding of responsibility for a sexual offense can have a 'lasting impact' on a student's personal life, in addition to his 'educational and employment opportunities,' especially when the disciplinary action involves a long-term suspension." *Univ. of Cincinnati*, 872 F.3d at 400 (quoting *Cummins*, 662 F. App'x at

446); *see also* Ellman-Golan, *Saving Title IX: Designing More Equitable and Efficient Investigation Procedures*, *supra*, at 175 (An individual accused of sexual misconduct "will see his own rights curtailed. He may be forced, even as an interim measure, to move out of university housing or to withdraw from certain classes or to avoid a certain dining hall during certain periods of time. He may be suspended or expelled from school. . . . And as some states . . . begin to pass legislation requiring schools to note on a student's transcript whether the student was suspended or expelled for sexual misconduct, he may face severe restrictions, similar to being put on a sex offender list, that curtail his ability to gain a higher education degree." (internal citations omitted)). Thus, the effect of a finding of responsibility for sexual misconduct on "a person's good name, reputation, honor, or integrity" is profound. *See Goss v. Lopez*, 419 U.S. 565, 574 (1975).

When a student faces the possibility of suspension, we have held that the minimum process a university must provide is "notice of the charges, an explanation of the evidence against the student, and an opportunity to present his side of the story before an unbiased decision maker." *Univ. of Cincinnati*, 872 F.3d at 399–400. "In some circumstances [such as] where factual issues are disputed [and the student is not permitted to attend the adjudication proceeding], notice might also be required to include the names of witnesses and a list of other evidence the school intends to present." *Flaim*, 418 F.3d at 635. Furthermore, if the credibility of an alleged victim is at issue, the university must provide a way for the adjudicative body to evaluate the victim's credibility and "to assess the demeanor of both the accused and his accuser." *Univ. of Cincinnati*, 872 F.3d at 406. But the protections afforded to an accused, even in the face of a sexual-assault accusation, "need not reach the same level . . . that would be present in a criminal prosecution." *Id.* at 400 (quoting *Doe v. Univ. of Ky.*, 860 F.3d 365, 370 (6th Cir. 2017)); *see also Flaim*, 418 F.3d at 635 n.1 ("A university is not a court of law, and it is neither practical nor desirable it be one." (quoting *Gomes v. Univ. of Me. Sys.*, 365 F. Supp. 2d 6, 16 (D. Me. 2005))).

On appeal, John does not ask for additional procedures beyond what we have already held to be required. Rather, John suggests that these procedures should be strengthened considering the significance of the private interest at stake. Appellant Br. at 44–46.

### 1.  Unbiased Decision-Maker

John's main argument is that his procedural-due-process rights were violated because he was not given the opportunity to present his side of the story to an unbiased decision-maker. Appellant Br. at 45.  "[S]chool officials responsible for deciding whether to exclude a student from school must be impartial."  *Heyne*, 655 F.3d at 567.  However, "[i]t is also well established that school-disciplinary committees are entitled to a presumption of impartiality, absent a showing of actual bias."  *Cummins*, 662 F. App'x at 449.

John alleges that Vaughn, one of three members of his Administrative Hearing Panel, was biased against him because:  (1) she was his investigator, prosecutor, and judge; and (2) she had pre-determined his guilt.  Appellant Br. at 46.  "[D]ue process is not necessarily violated when the school official who initiates, investigates, or prosecutes charges against a student plays a role in the decision to suspend the student."  *Heyne*, 655 F.3d at 567 (first citing *Lamb v. Panhandle Cmty. Unit Sch. Dist. No. 2*, 826 F.2d 526, 529–30 (7th Cir. 1987); and then citing *Brewer ex rel. Dreyfus v. Austin Indep. Sch. Dist.*, 779 F.2d 260, 264 (5th Cir. 1985)).  Due process may, however, be violated when "a school official's involvement in an incident created a bias such as to preclude his affording the student an impartial hearing."  *Brewer*, 779 F.2d at 264 (internal quotation marks omitted).

Here, John argues that Vaughn's dual roles undermined her neutrality enough to overcome the presumption of impartiality afforded school officials.  Appellant Br. at 46.  For support, John alleges that Vaughn dominated the hearing and that her remarks were designed to reduce John's credibility while bolstering Jane's credibility.  R. 39 (Am. Compl. ¶ 58) (Page ID #1986).  Vaughn's alleged dominance on the three-person panel raises legitimate concerns, as she was the only one of the three with conflicting roles.  Furthermore, John alleges that Vaughn announced during the hearing that "I'll bet you do this [i.e., sexually assault women] all the time."  *Id.* ¶ 66 (Page ID #1988).  This statement implies that Vaughn had determined prior to the hearing that John was responsible for the misconduct alleged in this incident and had a propensity for engaging in sexual misconduct.  Thus, although an individual's dual roles do not per se disqualify him or her from being an impartial arbiter, here John has alleged sufficient facts

plausibly indicating that Vaughn's ability to be impartial "had been manifestly compromised." *Heyne*, 655 F.3d at 568.

John also alleges that the two other members of his Administrative Hearing Panel (Van Gundy-Yoder and Elliott) and the two individuals who decided his appeals (Ward and Brownell) were not neutral decision-makers. Appellant Br. at 47. He argues that Van Gundy-Yoder and Ward were biased due to their research interests. R. 39 (Am. Compl. ¶¶ 54, 74) (Page ID #1985, 1991). But merely being a feminist or researching topics that affect women does not support a reasonable inference that a person is biased. John also alleges that all of these individual defendants faced institutional pressures to find him responsible due to external influence from the federal government and lawsuits brought by private parties. R. 39 (Am. Compl. ¶¶ 86–100) (Page ID #1996–2001); R. 40 (Pl. Ex. 30: White House "Not Alone" Report at 22) (Page ID #2315); R.40–2 (Pl. Ex. 32: Miami Univ. Training at 49–54) (Page ID #2504–09).

These generalized allegations of institutional pressure, however, do not suffice to show that Van Gundy-Yoder, Elliott, Ward, and Brownell were actually biased, thus overcoming the presumption of impartiality afforded to them. *See Cummins*, 662 F. App'x at 449. John's complaint is silent as to how the public pressure to combat sexual misconduct on college campuses and the governmental pressure to comply with Title IX affected these individual defendants' decisions. This is not, for example, a case in which individual decision-makers were instructed by a superior to alter their disciplinary decisions based on the identity of the student. *See, e.g.*, *Heyne*, 655 F.3d at 569 (holding that a plaintiff had alleged sufficient facts to support the inference that two arbiters were, although not personally biased against the plaintiff, partial because they had been instructed by the school principal "to enhance both the charges against and the discipline imposed on" the plaintiff because of his race). One could imagine a case in which the pressure placed on a university caused employees to feel that they must reach certain outcomes in the institution's adjudicative process in order to protect their own career prospects.

But that is not what is alleged in this case. Consequently, John has not alleged sufficient facts to overcome the presumption of impartiality afforded to these four defendants.[8]

### 2. Notice of the Charges and Explanation of the Evidence

John's second-due process argument is that Miami University did not provide sufficient notice or an explanation of the evidence against him. Appellant Br. at 44–45. John's argument that the University provided him insufficient notice is unavailing. The timeline of the multiple communications Miami University had with John prior to his hearing, detailed in Section I *supra*, demonstrates that John had notice of the charges against him two days after the incident occurred and that the University explained the allegations against him in an in-person meeting eight days later. As the district court noted, *Miami Univ.*, 247 F. Supp. 3d at 893, the type and timing of the notice John received is very similar to the notice in *Cummins*, which we held "was

---

[8]The defendants also argue that the partiality or impartiality of Ward and Brownell is not dispositive, because a student has no due-process right to appeal a school's disciplinary decision. Appellees Br. at 41. In support of this proposition, the defendants cite *C.Y. ex rel. Antone v. Lakeview Pub. Sch.*, 557 F. App'x 426, 434 (6th Cir. 2014), and *Flaim*, 418 F.3d at 642. In *Flaim*, we said that "[c]ourts have consistently held that there is no right to an appeal from an academic disciplinary hearing that satisfies due process." *Flaim*, 418 F.3d at 642. However, we then considered whether an appeal was part of the due-process rights to which Flaim was entitled under the *Mathews* framework. *Id.* We concluded that given the "rather unique" circumstances of the case—Flaim was expelled on the basis of a felony conviction—Flaim was not entitled to an appeal. *Id.* at 643. In doing so, "we strongly emphasize[d] that a disciplinary hearing involving a record of conviction is wholly different from a case involving disputes of fact, even if the university believes the evidence to be overwhelming." *Id.* at 643 n.7. *C.Y.*, meanwhile, involved the expulsion of a high school freshman for bringing a knife to school and threatening to stab another student. *C.Y.*, 418 F. App'x at 427. In this unpublished decision, we relied on *Flaim* to reject C.Y.'s claim that she had the right to an appeal. *Id.* at 433.

Neither of these cases forecloses the possibility that in a school discipline case in which the private interest is so significant—a potential lifetime of stigma and preclusion from further educational and employment opportunities—and there is a dispute about the facts of the events in question, due process entitles a student to some type of appeals process. *Cf. Flaim*, 418 F.3d at 642 n.6 ("An appeal is valuable for many reasons, among them being the gravity of the decision to expel a student from medical school, the personal and professional consequences an expelled student will face, the institution's role as an educator and teacher of young people, and more. An appeal also provides additional assurance to the institution that a just result has been reached and provides the student with, irrespective of the outcome, significant participation value."); *Heyne*, 655 F.3d at 569 ("Students have no constitutional right to appeal the decision of school officials *to suspend them for ten days or fewer*." (emphasis added)). We do not need to reach that question here, because, even assuming due process provides a right to appeal, John has failed to allege a violation of his due-process rights at the appeals level of Miami University's discipline system. As explained above, John's claim that the individual defendants who heard his appeals were not neutral arbiters because of institutional pressures is not viable. Furthermore, although his allegation that he was denied access to a recording of his panel hearing when preparing his appeal might raise a due-process violation, Appellant Br. at 45, John does not allege that any of the individuals he has sued under § 1983 had control of this recording and denied a request to access it. *See* R. 39 (Am. Compl. ¶ 56) (Page ID #1985) (alleging that John requested "Miami provide him a copy of the recording" and that "Miami failed to provide" him the copy).

sufficiently formal and timely to satisfy due-process requirements and provide appellants with a meaningful opportunity to prepare a defense," 662 F. App'x at 447.

John also argues that Miami University did not sufficiently explain the evidence against him because it withheld his disciplinary file from him. Appellant Br. at 45; R.39 (Am. Compl. ¶ 102) (Page ID #2001). John asserts that it is the University's policy for its Title IX investigator to interview individuals connected to the incident in question, compile written statements, police reports, and any other relevant documentation into a report. R. 39 (Am. Compl. ¶ 101) (Page ID #2001); R. 40-4 (Pl. Ex. 45: Minutes of Title IX Training at 3) (Page ID #2664). This report is then sent to the Office of Ethics and Student Conflict Resolution "for appropriate disciplinary action." R. 39 (Am. Compl. ¶ 101) (Page ID #2001); R. 40-4 (Pl. Ex. 45: Minutes of Title IX Training at 3) (Page ID #2664). John alleges that Miami University refused to provide this report, or the evidence against him contained within the report, even though the University's policies state that he was allowed access to this evidence. R. 39 (Am. Compl. ¶ 102) (Page ID #2001–02); R. 39-2 (Pl. Ex. 9: Miami Univ. Title IX Policy at 15) (Page ID #2182). The district court was correct to note that a mere failure by the University to follow its own internal guidelines does not give rise to a procedural-due-process violation. *Miami Univ.*, 247 F. Supp. 3d at 893; *see, e.g.*, *Cummins*, 662 F. App'x at 445 n.2. The Constitution does require, however, that the student be provided the evidence against him. *Univ. of Cincinnati*, 872 F.3d at 399–400. Thus, to the extent any of the evidence contained within this report was used by the Administrative Hearing Panel to adjudicate John's claim, and John was not provided this evidence, he has alleged a cognizable due-process violation. Because John has alleged that this report was held by the Office of Ethics and Student Conflict Resolution, it is plausible to infer that Vaughn, as director of that office, had control of this report and could have provided him access. John does not allege, however, that any of the other individual defendants he has sued had control over the report. Thus, John has sufficiently pleaded allegations with respect to this aspect of his procedural-due process claim as to Vaughn, but not as to the other individual defendants.

* * *

To summarize, John has sufficiently pleaded a procedural-due-process claim against Vaughn based on the claims that she was not an impartial adjudicator and that she did not fully provide him the evidence used against him. Thus, we reverse the district court with respect to these claims against Vaughn. We affirm, however, the district court's dismissal of John's procedural-due-process claims against Van Gundy-Yoder, Elliott, Ward, and Brownell.

## D. Qualified Immunity

The district court also found that the individual defendants were entitled to qualified immunity from all of John's § 1983 claims on the basis that he had failed to state a claim that his constitutional rights were violated. *Miami Univ.*, 247 F. Supp. 3d at 896. There is "a two-part test [that] determines whether qualified immunity applies: '(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established.'" *Heyne*, 655 F.3d at 562 (quoting *Colvin v. Caruso*, 605 F.3d 282, 290 (6th Cir. 2010)). These two prongs may be addressed in any order. *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016). If either prong is not met, then the government officer is entitled to qualified immunity. *Id.*

As John has failed to state a claim that his substantive-due-process rights have been violated, qualified immunity shields all of the individual defendants from this claim against them. We therefore affirm the district court's holding that the individual defendants are entitled to qualified immunity from John's substantive-due-process claim. Furthermore, because John has failed to state a claim that Van Gundy-Yoder, Elliott, Ward, or Brownell violated his procedural-due-process or equal-protection rights, we affirm the district court's holding that these four defendants are entitled to qualified immunity with respect to Count 6 and 7 of John's complaint.

John has, however, sufficiently alleged a claim under § 1983 that Vaughn violated his equal-protection and procedural-due process rights. *See* Section IV.A and C *supra*. All of these rights were clearly established in the fall of 2014. John's "right to freedom from invidious [gender] discrimination under the Equal Protection Clause was certainly clearly established at all

times pertinent to this action . . . ." *Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 681 (6th Cir. 2011). John's procedural-due-process right to an impartial adjudicator and access to the evidence used against him was also clearly established. First, viewing the allegations in the light most favorable to John, we conclude that a reasonable person in Vaughn's position should have known that she was partial and that she could not, therefore, sit on John's Administrative Hearing Panel. "The impropriety of [Vaughn's] alleged conduct in failing to disqualify [her]self should have been apparent based on *Goss*[, 419 U.S. at 579–84], *Newsome*[ *v. Batavia Local Sch. Dist.*, 842 F.2d 920, 927 (6th Cir. 1988)], and other precedent directly on point." *Heyne*, 655 F.3d at 568. Second, John's right to view all of the evidence against him is clearly established. *Id.* at 565 (citing *Goss*, 419 U.S. at 582). Thus, we reverse the district court's holding that Vaughn is entitled to qualified immunity from John's equal-protection and procedural-due-process claims.

## V. CONCLUSION

We **AFFIRM** the district court's dismissal of John's Title IX hostile-environment claim, Title IX deliberate-indifference claim, and § 1983 substantive-due-process claim. We also **AFFIRM** the district court's dismissal of John's § 1983 procedural-due-process and equal-protection claims and related finding of qualified immunity with respect to Van Gundy-Yoder, Elliott, Ward, and Brownell. We **REVERSE** the district court's holding that John did not sufficiently plead his Title IX erroneous-outcome claim. Furthermore, we **REVERSE** the district court's dismissal of John's § 1983 procedural-due-process and equal-protection claims against Vaughn, as well as its holding that Vaughn was entitled to qualified immunity. We **REMAND** for further proceedings consistent with this opinion.